Good morning. May it please the court. My name is John Campbell. I'm here with my co-counsel Justin Marceau. I have the privilege of representing the plaintiff's appellants in this case. It is always an honor to argue in front of a federal circuit. It is uniquely interesting to argue in front of a few hundred of your friends. It certainly applies a little pressure to boil your case down and keep it simple. And so, your honors, I spent a lot of time thinking about how to tell you this case in 20 seconds. I know you've read the briefs carefully. And so it occurred to me that really it boils down to three issues. The first revolves around our claim that there was an illegal arrest and excessive force. And on that, although we briefed a number of things, I think that what I would focus on today is very straightforward. And that is that under our set of facts, taking our facts as true, because this is a summary judgment posture, our evidence would support that Tiffany Hupp walked down a hill calmly with her hands by her side, stood in her testimony catty corner to the officer, and said, don't shoot. She was asking him not to shoot a dog who was on a leash wagging its tail in front of her three-year-old son. The U.S. Supreme Court in Hill, this court in Kiddo, and the West Virginia Supreme Court in a variety of cases, including Jarvis and a case called Kuski, K-U-S-T-K-E, have all said that it is not obstruction and can't be obstruction to ask an officer not to do something, even to remonstrate an officer, to criticize an officer. Now, I understand that Mr. Mullins will say, well, there's a set of facts that say that Tiffany Hupp was angry and she was cussing and she was waving her hands and she was threatening. That is the factual dispute for that claim. If she was simply saying, don't shoot the dog, which is her testimony crystal clear and the video shows her with her hands by her side, she says she's catty corner and we can see that the officer has to step towards her. Then this is classic, Your Honor, Judge King, I believe you wrote Kiddo. And in Kiddo, that was a Virginia case, the argument was that if you only talk back to an officer, even disagree with that officer, even refuse to move, that under Hill, because that's a First Amendment right, that can't be obstruction. So that's the first basket. And I'll briefly mention the other two. The exigency claim, which we briefed probably most heavily. Unless you had five claims you're appealing. Yes, Your Honor. Let me be a little more clear. The arrest and excessive force claims I would view as moving mostly together in the ones I just discussed. The factual dispute that turns on whether or not Tiffany Hupp has established, at least if her evidence is viewed in the light most favorable to her, that she was peacefully asking an officer not to engage in this act. And that instead of simply saying, you know, in engaging with her, he grabbed her, and at worst she pulled back when she was grabbed, which is sort of a natural instinct. Those two claims I think move mostly together. Then we have two claims, which are the entry and search and seizure claim. And those are a pure question of law. Because there are no disputed facts that I can identify in that setting, and I don't think there's been any identified in either brief. On that claim, what we have is we have an officer who enters a home without a warrant. We know that that is presumptively illegal, and that it's their burden to show why they should be able to do this very unusual thing, enter a home and seize evidence without a warrant. We also know that the Supreme Court, and in this case in Cutco, this court in Cutco, had long said that if it's a minor offense, it's difficult to conceive of a reason to enter a home without a warrant. So the bar is pretty high for the defendant to articulate this exigency exception. Exigency under this court's precedent in Turner has five factors. We look at whether or not it was urgent to go in because you couldn't get a warrant. We look at whether or not the evidence is likely to be destroyed, whether or not there's some symbol of concealment. Well, that's what he says, though. He thought the evidence was going to be destroyed, didn't he? Well, Your Honor, I think what Officer Cook testified to was that he believes people generally destroy evidence. And when we asked him, why did you think you could go in, he said, well, I always seize video evidence, every time. And I asked him, every time? And he said, yes, every time. And I said, what if they say no? And he said, well, that gives you exigency because they refused to consent. In this case, Your Honor, the classic case, as you know, Turner and others, you have somebody who is, they have contraband, and they're giving indicia that they're going to conceal it or destroy it. And the officer sees something. They see scurrying. They hear somebody say something. They see them run to the back. This, I would suggest, is actually the paradigm of sort of the opposite thing that happens. So here we have Ryan Hupp, who's videoing inside the house. His wife is crying by the police car. She's saying, help me. And he says, don't worry, babe. Forgive me. I got that shit. That's a direct quote. He announces to the officer and his wife that he has the evidence. He's not concealing it. He's voluntarily disclosing it. Then he says it in such a way that only suggests he's glad to have it. He believes it will exonerate his wife. I asked Officer Cook, how did you understand what he said? Officer Cook said, I understood what he said to mean, that he was glad he had it. He did not dispute that. So at this point, rather than concealment, we have disclosure. Rather than contraband, which sort of everybody has a motive to get rid of. I mean, if the cop comes in and you have drugs, you're going to get in trouble. This, instead, we have exculpatory evidence and legally gathered evidence by a citizen. Rather than the officer seeing someone scurry away, you have someone telling him. So then Officer Cook turns when he learns he's been recorded and charges towards the home. He doesn't make a phone call to see if he can get a warrant. There's nothing in the record that would have taken an hour that he couldn't have gotten a warrant in five minutes. He doesn't see anybody scurrying to destroy the phone. His testimony is he walks in the house, no consent. We have an illegal entry at that point. And he looks and he sees some phones on the table and he seizes them. So yet again, if the phones are laying on the table, there's certainly no evidence they're being concealed. He sees four phones? He sees four phones. And, Your Honor, to be clear, he knew that his belief was one recorded. Interestingly, there's no effort then to even discern which one records. Certainly he doesn't ultimately discern that. Doesn't get a warrant. Simply seizes all four. And so, Your Honor, if we sort of click through these elements, we're supposed to have a serious offense. We have a minor offense. We're supposed to have evidence of concealment. We have open disclosure. We're supposed to have contraband. We have exculpatory evidence. By the way, I would just step back and say, if we think about this holistically, it's interesting. Because this video that the husband viewed as exculpatory was, in fact, exculpatory. It was published to the Internet. People were upset by what they saw, an officer pointing a gun at a friendly animal. And then, when it was showed at Tiffany Huff's trial, they acquitted her in under 30 minutes. Now, the officer who seized it, Trooper Cook, who ran to the home and said, I have to have it, couldn't have him destroy it, two months later, hasn't viewed it, did not provide it to the magistrate when he filed the criminal complaint, and instead put things in the criminal complaint that were untrue and that the video would have refuted, which really brings us to malicious prosecution. At that time, had he seen the video? Your Honor, it is unclear to me whether he went and watched the video. I would certainly say to you that if he has not, and his position was that this video is essential evidence, then at least we'd see a mention of why he hasn't seen the video or tell the magistrate a video exists so the magistrate could obtain it. None of that happens. Instead, we get a criminal complaint that says things that are palpably untrue. It says Tiffany Huff's waving her arms. It says Tiffany Huff is cussing. It says the dog Buddy is continuing to snap and snarl while she's in his line of sight. So if you just read this, you get a picture of an officer who's being threatened by a very dangerous animal, and a woman is coming at him and about to knock him down, and what else is he going to do? The problem is that that's not what the video shows. That's not what Tiffany Huff says happened. Your Honor, Judge Greger, you wrote, I believe, is it Humbert, H-U-M-B-E-R-T, and you also sat on Evans v. Chalmers. And I think those sort of paint the last issue, the malicious prosecution claim. There's a federal and state, and that's where you get the two more claims. In Evans, of course, the police officers provided all the information to the prosecutor. The prosecutor brought charges that ultimately weren't correct, but you said the police officers are immune from a malicious prosecution claim because they were open and disclosed. And you said if they had misled or omitted or in some way unduly influenced, they could be responsible. In Humbert, we had police officers provide evidence for a search warrant, and they did not later reveal to the court that the eyewitness had recanted. And this court held that if a police officer misleads or omits facts from a warrant or application, at that point they've waived their immunity is one way to think of it. They had a chance to just be forthcoming. In this case, I would say the law in this court is clearly established that if you lie, omit, or unduly influence, then you stand for malicious prosecution and a jury decides. What exactly is the lie here, exactly the lie you said? Sure. The criminal complaint is at JA 508, and there are. I want you to tell me what's the exact thing you said that was a lie. You said a lie. A lie is not the same thing as stating what's not true, right? You can say something that's not true, and it wouldn't be a lie necessarily. I think you're right, Your Honor. You could be mistaken. Right. So here's one. I think maybe the operative lie because it's what creates the obstruction. All right. So Officer Cook says that while he's pointing his gun at Buddy, that Buddy is continuing to advance, clacking his teeth, snarling, and lunging. And so he has to keep a line of sight lest he be mauled, and that Tiffany Hupp interferes with his ability to keep eyes on a dangerous dog. And he says in that complaint that- Well, if someone comes from your peripheral vision and you have a dog here and someone comes from your peripheral vision, doesn't that interfere with what your concentration is 100% on what's before you? Your Honor, I take your point that it could, although I would first say- Absolutely. I would say- How is that a lie? How is that a lie? Well, the lie is that the dog is doing any of the things he describes. So here's what's interesting. Well, the dog is not licking him and wagging his tail, right?  The dog is wagging its tail, looking up at the house. And Trooper Cook testified once he was in a deposition and we were able to sit for a while. He testified he knew it was on a leash, that it was, in his words, in a Mexican standoff. It was not advancing. And that he knew- I'm sorry, Your Honor. I just want to say he knew it wasn't a threat. The problem is, though, all owners say that when someone is walking by, the dog comes out. Oh, he wasn't biting. He doesn't bite. He doesn't bite. People who don't know the dog say, how do I know that? I mean, that's a natural response. I mean, I just think you said a lie. Do you have to show it that it's a lie? No, Your Honor. You saw my pivot. Thank you. Here is my pivot. You've also said that an omission is sufficient. And so here's the odd thing. We just look at it a little bit. Trooper Cook says this video is really important. He says this is what will prove the case. Now, Ryan Hupp and Tiffany Hupp believe this is what will exonerate. Ultimately, it does. When he gives this statement to the magistrate, let's say it's just not perfectly true for the moment. What's the timing of the matter? It was submitted in May, and so it was about three months after the arrest, I believe. And I can check that. But it was certainly not the next day. This was after he meets with her, and the prosecution occurred almost six months later, and he said the same things at trial. But when this is submitted, Your Honor, it's an omission, because he doesn't mention that there's a video or provide the video. And so we wouldn't be having this discussion about what did the judge know if the judge had simply been provided all the information. I'll just mention one last thing that I think at least makes this a question of fact. And that's all we're suggesting here today is that there's a question of fact. The last thing is that when I asked Colonel Smithers, who was a defendant in this case, he was the former colonel of the West Virginia State Police. When I talked to him about dealing with prosecutors, he openly conceded that West Virginia State Police, in his words, nudge prosecutors in the right direction. And then we sought discovery in this case, so that we could know what Trooper Cook said to the prosecutor. And that discovery was denied. And so we have sort of a black box where we don't know what was said between these people, but we do know that the video itself doesn't match what was said in the criminal complaint, and that the magistrate, I suspect, if I could go talk to him, would say, I'd sure like to have all the evidence, not some of it. And so for that reason, there's at least a factual. You're sort of saying the prosecutors don't act in good faith. What I'm saying, Your Honor, is prosecutors can't act in good faith if they're not given full information, nor can judges. No, you're saying they've been nudged if they're not doing their job. I was stunned by the statement by the colonel of the West Virginia State Police that they nudge prosecutors. But that was his testimony. It was unsolicited. I wasn't really even on that topic. And so I think it's my obligation to tell you it was said by someone who knows, and at least creates a question of fact that we need to wrestle with. And so, Your Honors, to just briefly wrap this up, I think what we have here is we have a situation where, from our point of view, we have a person acting as a respectful citizen. What I think most of us would do if an officer is pointing a gun at an animal in front of our son, walk down a hill and say, please don't shoot. We have an officer who, rather than respond or simply put his gun away because he knows the dog isn't advancing, grabs, moves towards and grabs the citizen. There's force there. And she, at most, tries to sort of, she reacts. We have an entry in which the only facts are that it was a minor crime, that there was open disclosure of the evidence, that no one was rushing or trying to conceal and that they were glad to have it. And we have a malicious prosecution in which the facts presented to the magistrate were far from complete, making it at least an omission with the potential to mislead. We would ask that you reverse the summary judgment and that on the entry and seizure claims, you grant summary judgment in our favor because there are no disputed facts. Thank you, Your Honors. Thank you. Mr. Mullins. Thank you, Your Honor. If it pleases the court, I'm here representing Trooper Cook in this matter. This is a case in which the district court, under the Scott versus Harris decision, watched a video of the incident that gives rise to this lawsuit. And in watching that video, the district court and the piece of the judge's chambers, with months to look at this and read briefs and fast forward and rewind and watch it in slow motion, determined that there was probable cause to arrest Tiffany Hupp for obstruction and that her prosecution was also based on probable cause and also that the force was constitutional. In other words, what District Court Judge Johnston did after reviewing this case, reviewing the evidence in the case through the video, he determined that the trooper's conduct was constitutional. Now, what Tiffany Hupp wants you to do is to go back and look at what the district court judge did and determine not only that the district court judge was wrong, but that no reasonable person could, not would, no reasonable person could have come to the same conclusions. Was the district court entitled to find facts in the context of the summary judgment ruling? I'm sorry, Your Honor. Was the district court entitled to find the facts in connection with its summary judgment ruling in your favor? I believe so, Your Honor. Under the Scott decision, Scott versus Harris, which involved a motorcycle pursuit in front of the Supreme Court and conflicting testimony about what happened in that motorcycle pursuit. And the United States Supreme Court said, we don't need to look at the testimony because we have a video of what happened and we can look at the video and determine what happened and make findings of fact based on the video. And that's what the judge did here. But it's almost like you're saying it was a bench trial rather than a summary judgment proceeding. That's what kind of bothers me about it. I don't believe so. I left one with you. I'm sorry? I thought we were supposed to take the facts in the light most favorable to the non-moving party, which would be the other side of your case. At the court, district court. And that's the way we're supposed to look at them on appeal. In the light most favorable to the non-moving party below. And I believe the Scott decision allows the court to sidestep that slightly and look at the undisputed evidence that's presented in the video and not have to sit back and wait. But there's more to the video in this case. Didn't your client say, come here, come down here and control your dog? He did, Your Honor. Well, that means that she was responding to his request. First of all. What she testified to was that she didn't come down to get the dog. She came down there and confronted the trooper. The first thing she wanted to do to control the dog is, I think she said, basically, don't shoot my dog. One of the controls is my dog will be living while I'm controlling. The first thing is, you're about to shoot him. Don't shoot the dog. Now let's deal with the dog, right? Isn't that be a natural response? Come down and control your dog. Okay, I will. Don't shoot him right now. Let me talk to him. The natural response would have been to come and to get the dog. No, the first natural response is stop somebody from killing your dog. You got a gun. He's coming to get the dog. I said, please, put the gun away. I'm going to talk to him. Calm him down. Because there's no need to calm him down. He's dead. Right? Am I right? If he had shot the dog, yes, but he didn't shoot the dog. But the gun was trained on him. It was trained on him. And she said, don't shoot my dog. That's what she said. What's wrong with that? When the police officer tells you, come down and control your dog. She got between the trooper and the dog. Well, to show that, it shows that she's sort of perpendicular in the sense that she's not between the dog. The officer actually pulls her sort of toward the in-between position. So even the video on the Scott doesn't help you really completely, even if it was disembodied, which it is not, because you have to look at what was said in the context of what you see. So you want us to do, as Judge King asked, to decide all the facts in your favor? Is that what you want us to do? No, Your Honor, I want you to do it. Because we can't do that as a matter of law. Thank you. All right. When she got down there in front of him, and what her husband said was that she jumped in front of the trooper's gun, the plaintiff's own expert said that once she was standing there in front of the gun, when he has his gun drawn, that that creates a situation where now she could potentially grab the gun. She's in between him and the gun. She doesn't go to get the dog like he had asked her to do. And the plaintiff's own expert, Scott Defoe, said that in that situation it would be appropriate to try to move her out of the way, which is what he tried to do. And the plaintiff's husband, Brian Huck, said that he told her to move out of the way, something to that effect. And then he tried to move her out of the way. In the process of trying to move her out of the way, she then set her feet, and she lifted her arms up,  And then she was taken to the ground. She was taken to the ground in a use of force. But as Judge Johnston noted, it was about the least amount of force that you could possibly use. And as soon as she was taken to the ground, there was no additional force. Her injuries are indicative of a slight amount of force, and a slight amount of force gravitates towards that force being reasonable. She received medical treatment, didn't she? She did. She went to the doctor the next day, and she had a bruise or a scratch or something like that. She didn't have any follow-up after that. But she did receive some kind of medical treatment. She went to get checked out. You want us to rule that as a matter of law that that's not an injury? No, I want the court to take into consideration the minimal nature of that injury, vis-a-vis the minimal nature of the force that was used as well. This isn't a case, and there's cases that this court has talked about, Rowland v. Perry, where somebody ended up, they leaned over to get a $5 bill and ended up with a dislocated knee or a fractured patella or something like that. And the court weighed the reasonableness of the force versus the injury that occurred here. Here, she did have some injury, but it was a very minor injury. And I think that that goes toward the reasonableness of the force. Had he shot her, we'd obviously be in a different situation. Had she ended up with a broken arm or a broken nose or something like that, we'd be in a different situation. They also want this court to strip my officer of qualified immunity. And, you know, here we are talking about a video, rewinding, fast-forwarding, slow motion. My officer had a split second to make a decision. And the court is clear that an officer's conduct shouldn't be reviewed with 20-20 hindsight. We're not supposed to Monday morning quarterback what an officer did in this situation. He was involved in a tense situation. It was a rapidly evolving situation. It's agreed that it was constitutional for him to be into the yard and to watch somebody going inside of the house given the nature of the call that occurred. There was a fight, there was gunshots. He wanted to make sure that people did not go into the house and get a gun, whatever. He's doing his job, acting in his official capacity to protect his fellow officer. And so I don't think that the court should strip him of his qualified immunity given that situation. There's a lot of talk in the malicious prosecution claim that Mr. Campbell brought up about the magistrate not seeing the video. And this goes along with the exigency. Have you finished with the exigency warrantless? Or are you just skipping over that? Well, they go together. Oh, okay. We'll make sure you get to that. Yeah, I'm going to. But one of the things that I want to point out quickly about the malicious prosecution claim, and then I'm going to go into the exigency claim because these things are related, is that he sees the phone, obviously. Then he got a search warrant. And we'll get to that on the exigency. But they are now blaming him for not putting the video in the criminal complaint. Well, the criminal complaint was completed on the day of the arrest, May 9, 2015. The search warrant wasn't completed until May 11, 2015. So he could not... That's a search warrant for the phone? For the very phone that they're blaming for not... That already sees the phone. Right. And then they got a search warrant... Before they viewed it. Before they could look at it. Right. Which is exactly what they were supposed to do. But the big problem I've got here is going in the house. Your Honor, if there's... You've got a Fourth Amendment issue. I mean, a home is supposed to be somebody's castle. This might have been a house trailer or something. Mobile home. But that's where they lived. It's a home. Correct, Your Honor. Going into the home without a warrant. Now, that's presumptively unconstitutional. It is. But if they had... In the law. I agree, Your Honor. And you're saying it comes under the exigent circumstances exception. Yes. If they had an ex... If they had exigent circumstances that allowed them to seize the phone, then he had exigent circumstances that would allow him to enter the home in order to do so. And this is fact... Most of the time, we've got these exigent circumstances cases. They involve automobiles, for example, where they take off and go somewhere. As opposed to freestanding home. Or they involve somebody running from the scene of the crime and running to the house with the policeman chasing them where they've just committed a bank robbery or an assault or a robbery or armed robbery or something. And you've got exigent circumstances. I agree. There's a whole lot of cases... But here you don't have any of that. And you've got a home. Here you have a situation that's pretty interesting. And I appreciate you bringing up what we typically see with exigent circumstances. Somebody running into a house or somebody there to... They're in the middle of a chase. They're in the middle of a chase and they've got exigent circumstances. Yeah. But what you have, you have the Raleigh... The district court relied on three cases primarily to find that there were exigent circumstances here. And those three cases dealt with cell phones. And what's interesting, I believe, is that those three cases were penned, one in 2014 by the Supreme Court, the Raleigh decision. The other two decisions that the district court relied upon... Did it involve a warrantless entry of a home? Raleigh did not involve a warrantless entry of a home. Okay. But those three decisions, two of them were penned after the incident that gives rise to the lawsuit. And again, we've got to go back to this trooper needs some clear guideposts to let him know what's constitutional and what's unconstitutional. And so the law regarding exigency has existed, obviously, for a long time. But the law involving exigency in cell phones... Well, he said if you ask them for the evidence and they don't give it to you, that's exigent circumstances. That's what they claimed that he said. I didn't say that. He said that he typically sees his phones in that situation. But that doesn't matter here. What matters here, you don't look at the officer's subjective intent or the officer's history. What matters is whether or not this particular incident was constitutional and whether or not he's entitled to qualified immunity in the parameters of this particular incident. And that's been clearly delineated ever since the Wren decision. So by entry, you agree that the entry and the seizure of the phone go together. They do. They both require exigency. Right. If he didn't have a right to enter the home without a warrant, then the seizure is back. Or vice versa. Yeah. And so what Ryan Hupp testified to, as they pointed out, he came out and said something along the lines of, I've got that, explicative. And then he went back into his home. Ryan Hupp testified that when the trooper came to the door of the house, which was actually a cinder block step up into the trailer, he said, and this is on JA 149, question, but he was on the porch when you gave him the phone. Yes. At that point, when Trooper Cook took your phone, he already had taken all the other devices as well, question. In other words, do you remember if your phone was first? His answer, no. My phone was first. So the first phone that he took was on the porch of the house on the cinder block out in front of the house that they used for an entryway. And when, according to Trooper Cook, and this has been undisputed, when he asked Ryan Hupp to give him that phone so that he could take that evidence or to discuss that evidence, Ryan Hupp said he had deleted the information on the phone. And then Trooper Hupp, there's a long line of questioning, and it's in the JA, about why he decided to take not only the phone that Ryan Hupp gave him, but also the other three phones that were inside of the house. One of them was actually a tablet, but that's kind of a distinction without a difference. And he discussed that once Ryan Hupp had told him that the information had been deleted, that he wasn't sure which of the devices were, would be the device that potentially had the information on there. And in a decision, United States versus Brown, from 2001, 701, Fed Third, 120, this was one of your decisions, Judge King, it was a situation where officers had a search warrant to search a building for computers, and some people showed up that were suspects in their vehicles. And there was no warrant for their vehicles or what was inside of their vehicles, but the court allowed those officers to seize the computers from inside of the vehicles, finding that that was a warrantless search, but finding because of exigent circumstances, and the ease in which that evidence could be destroyed or concealed from the police, such that it could not be used in prosecution, weighed heavily in a decision to allow them to take those devices. And they took multiple devices because they knew that there was child pornography on a device, but they didn't know which device, so they took all of the devices. And that's similar to what we have here. There was a belief... You think that case is controlling here? Because what they found, it was something related to what was on the car, and they searched the car? That's related? I think it's related to this case. There's a whole different genre of cases where exigency is an automobile. But that case was not decided under the exigency of the ability for an automobile to disappear. It was under the exigency of the ease by which computer information can be deleted. That was the import of that case. So on your theory, if there were three other neighbors who had their cameras, as is want to do now, people film everything, they could go into everyone's home in the block and just go in there and get their phones. Well, they can ask them to think. No, no, I didn't say that. No, no, no. Exigency is to enter. That's the whole point of the Fourth Amendment. You know, the king is restrained from going into the home. That was the whole, the Magna Carta and all those things. They can say, no, I saw you filming this. I'm going into your home and get you a phone. Is that right? Wouldn't that be the logical extension of your argument? No, Your Honor. Tell me why not. What's the limiting aspect of your argument? A few things. One, they'd have to believe that there was probable cause on the video. The probable cause is they saw them with their phones in the direction of where he was with the dog and the plaintiff. And therefore, that's a pretty probable cause. They're filming it. OK, go ahead next. What else did you have? The second part of that was they would have to have a reasonable belief that the evidence might be destroyed or removed. Same thing you have here, right? Because you got your video and you're going to delete it. Because he does it all the time, right? But here you have something different. You don't only have this, you know, it's not, it's not some abstract belief that it might be destroyed. He told me, I got the shit. I mean, I'm going to keep it. But he then, when he found out that the trooper wanted it, and that's one of the factors, you know, information indicating that the possessor of the contraband knows the police are on their trail. So when he came and said that he would like to get the video, at that point he said that he had it destroyed. So he was happy to have it. Why did he go in then, if he's destroyed? He says, OK, well, no need to go in. Well, as they pointed out in their brief, just because something has been deleted on a cell phone, doesn't necessarily mean that it is something that cannot be captured. You can go, you can look in the trash pile. So that statement means nothing then in terms of your position as to why he was justified to go in. It had nothing to do with whether it was deleted or not. You're saying, I can still go as far as I want. And did. Go in and seize other phones. There's two ways that you can destroy evidence on a phone. One would be to delete it. The other would be to hide or conceal the phone. So you could delete the video information. Then you could take the phone and throw it in the river. So it's twofold. It's not as simple as, well, he deletes the information and I go and get a search warrant. I come back with the search warrant, get the phone, take it to some expert, and they're able to potentially find what was deleted. So the limiting aspect is that the other neighbors would have to give permission. They would be given an opportunity to give permission. And the limiting aspect is also, is whether or not there was. When you get an opportunity, you ask. Well, the first thing you do is. Well, they say no. Then you, they have to weigh whether or not they would believe that there's an indication that the video would be destroyed. And you got to look at those factors. Because the police officer could, if he wanted to, end up going into every house on the block. And asking if they had a video, yes. Determining whether or not there was exigent circumstances is different. He could decide to go on in. No, no, no. He'd have to have exigent circumstances before he'd go in. If they say no, that creates an exigency. That's a factor that looks into it. But you also need to know whether or not there's some kind of, you know, information. Some kind of testimony that would indicate that it's going to be destroyed. And here you had Ryan Huff saying, not only, not saying I'm going to destroy it, saying I have destroyed it. They say looking at the evidence of the like most favorable to the plaintiff. What's on the video is inculpatory to your client. Rather than exculpatory to your client. Based on particularly the statement made by the fellow that was making the video. And that's an interesting argument. I'd like to address that. No, but we have to look at it. You have to admit that the principle with respect to facts at this stage is that we take the facts in the light most favorable to the plaintiff. Not most favorable to your client. Understood. But they want to argue that the evidence was exculpatory for their client. The district court judge reviewing it found that the evidence established probable cause. Unless you have a trial to the court. Now, you all could have said we're going to let you try it, your honor. Then he could make all the findings he wants, much like a jury. But otherwise, on a summary judgment, you have to give the facts to the other side. And say even looking at the facts in the light most favorable to the plaintiff. My side wins. That's what you have to say to get summary judgment. That's the general principle of what summary judgment proceedings are all about. We get a lot of these cases. One thing we understand pretty well is summary judgment rules. Understood, your honor. And I believe that the court considered all the evidence and determined the evidence in the light most favorable to the plaintiff with the video. And came up to the conclusions it did. And that the opinions of the court are correct. That they were constitutional. And you've got to take that step back because it's a two-part test here. One was the conduct constitutional. And I think that a district court judge finding that the conduct is constitutional is really heavy evidence, strong evidence, towards the objective reasonableness of what my client did when you start to evaluate qualified immunity. I see I'm well out of time. Do you want me to continue? Do you have any questions? Thank you so much. Good morning. May it please the court. Your honors, this case is not well suited for disposition on summary judgment. As the argument this morning and the briefs make clear. The case is filled with factual disputes. Counsel for Officer Cook started with the video and said, the lower court judge reviewed that video and found, based on Scott versus Harris, certain facts. And even opined that the trial judge may be able to find those facts. That's not the rule. The rule that we start with is when there's video evidence, you look at it in the light most favorable to the plaintiff. This court in Witt versus West Virginia said that video evidence, like that in Scott versus Harris, is useful, it's helpful. You should never make findings that are clearly contrary to it. But you look at the video evidence just like any evidence in the light most favorable to the plaintiff. So if there's some ambiguity, it's construed in favor of the plaintiff. In terms of your honors' question about the exigency to enter a neighbor's house, I think that's exactly what would happen in this situation. Remember that the rule for exigent circumstances in the Yangle case from this circuit, cited on page 31 of our brief, is that you need specific articulable facts. I was listening really closely for some specific facts other than supposition, other than a theory that this might be deleted, even though he was happy to have it. And I didn't hear it. So imagine in a neighborhood where you have doorbell cameras all around instead of trailer houses like Judge King posited, and all these doorbell cameras now are catching, or the security cameras, catching an arrest out in the street. Well, let me read what Officer Cook said. He said, we asked, is it your policy that every time you work on a crime and you believe someone captured it on video, you can seize that device? Answer, yes, that would be my practice. So we were not paraphrasing. That is exactly what he said is his practice. If a person, quote, refuses, it's exigency. If they don't want to give it at this point, it's on exigency. I have the right to seize it. That's exactly why he did it here, and that's what we're going to see in every case, because we do not have any specific articulable facts suggesting that this entry was permissible. Now, counsel also said that Mr. Ryan Hupp, the video recorder, was outside on the porch, and he cited to the joint appendix for that, because Ryan Hupp did say that in his deposition. But every other witness, including our client, said that's not true, and including Mr. Mullen's client, Officer Cook. Officer Cook, at Joint Appendix 246, admits that he did, in fact, enter the house. So his best day for not entering the house is a disputed fact as well. On the question of probable cause for the arrest, Mr. Mullen suggested that Ms. Hupp was not complying with Officer Cook when he said, control your dog. At Joint Appendix 122, that's another disputed fact, Your Honor, which should have gone to the jury for a special interrogatory. Ms. Hupp testified, quote, she was trying to comply. I went down there because he said, control your dog. That's at Joint Appendix 122. She was trying to comply. At the very least, that's a disputed fact. Mr. Mullen has emphasized, as did the district court below, that the danger here, and part of the physical obstruction, was that she stood between him and a snarling dog, that they blocked the view, the line of sight, as Your Honor was mentioning. Well, first, the video doesn't show that. And second, in her joint appendix, she says she was standing catty-corner, which is exactly what the video shows. She says, I went down there. I didn't want to stand in front of the gun. I stood to the side of it. He still had a clear line of sight, and as my co-counsel suggested, if you look at that video, you're absolutely right. We don't know if a dog is dangerous, not dangerous. But at that point, while the gun is still drawn, it is absolutely clear in the video that the dog is looking away and wagging his tail. Persons could be confused at the other times, but at the moment she is down, it is undisputed in the video. That's the moment where Scott v. Harris will apply, because it is absolutely unambiguous. The dog is not barking, not snarling, as he claims in his report. On the excessive force claim, it might be worth spending a few moments on that because we haven't spent as much time. I'm not going to stand up here and say that this was the most extreme force that you're ever going to see. It's not. No one was killed, thank goodness. The dog was not shot, thank goodness. But it takes strong issue with Mr. Mullen's tip this morning and in the brief saying,  I would like to imagine a different state of affairs, where we don't imagine that someone is thrown to the ground and at Joint Appendix 546 reported to a medical clinic with an 8 out of 10 on pain. I don't think that's the least amount of force we can imagine. When I watch that video, I don't see that. So when I look at the three factors this court has prescribed for evaluating as a decision by you, Judge Gregory, Smith v. Ray, we look at the severity of the crime. It's the first factor to look at in excessive force. There's no dispute. And defendants have conceded on page 34 of their brief. This is a minor crime. Then we look at the reasonableness of the perceived threat. This court has held that the reasonableness of an officer's after-the-fact assertion that he perceived a threat is a question of fact when there's credibility issues around the officer. The credibility would be a jury question. And there are lots of facts here that we can't go into today. But we think there's disputes about the periphery. You don't take a segmented view this court has held in Rowland v. Perry. If you look at the totality of the circumstances, this officer's credibility is going to be called into question. The last factor you look at in excessive force is whether there was a resisting of arrest. And very importantly, Smith v. Ray, again, Judge Gregory, your decision notes what would resisting an arrest look like? Well, in Smith, the woman was grabbed by an officer and she pulled away. Not once, she pulled away twice. And then she referred to the officer as the N-word. And then he threw her to the ground, not unlike what happened here and got on top of her and handcuffed her. This court held unequivocally that resisting by pulling away is what you would expect a person to do when they're surprised by being grabbed. She went down trying to comply with an officer's command to control your dog. She was grabbed. Cook admits in his discovery request at Joint Appendix 42, he grabbed her first. Her arms were not up, even though that's in the police report, by the way, even though that's in what he submitted in the measure. That's a reckless disregard of the truth, Your Honor. She did not raise her arms at him. He grabbed her first. Then she was on the ground. In those circumstances, under Smith v. Ray, we're looking at excessive force. Now, is it a $10 million case? No. But as a matter of law, this should be an issue that goes to the jury to look at credibility. You started out with like 11 claims in your case, right? I think it was 11 or 12, Your Honor. Yes. Kind of a shotgun approach. Now, on appeal, you whittled it down to five. Yes, Your Honor. Which one is your best one? Your Honor, I think that each of these claims, I think the exigent circumstance claim demands a judgment in our favor. I don't think there's any dispute of fact on that claim. So in terms of a hierarchy of claims, I would start with the entry and seizure, which have not been separated. And those claims, I think, call out for a judgment as a matter of law. You think that we ought to award you judgment on the unlawful entry of the home? Is that what you're saying? Yes, Your Honor. And on the seizure of the phone? Yes, Your Honor. So you think you're entitled to two judgments as a matter of law on two of the five claims? Yes. And what, a trial on the other three? Yes, Your Honor. Okay. Your Honor, I think there are no disputed facts. When I listened today, I took careful notes. I didn't hear Mr. Mullins raise any disputes on the facts. We would accept his version of events. The cook was outside. He heard the guy say, I've got video. The cook then testified. When I heard him say he had video, that's when I decided to go inside and seize it. We accept all of his facts as completely true, and we think the entry and the seizure of the items we're entitled to as a matter of judgment. Now, on the summary judgment standard, we think all the claims are probably equally strong. Judge Gregory, I see that my time has expired, so I want to be quick, but in one final last response to your question, you said, well, what are the lies? I would note that, Your Honor, you mentioned in Humber that it's not just direct intentional lies. It's also reckless disregard of the truth. And I would encourage this court, when you go back, to read 508. Read what he submitted to the judge. Now, if you take away the mistruth or the reckless overstatement, it would be very hard to find probable cause for that magistrate who was looking at this case, with only that paper record. Thank you. Thank you. All right. We'll come down to brief counsel and proceed to our next case.
judges: Roger L. Gregory, Robert B. King